UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                       :
UNITED STATES OF AMERICA,           :
                      Plaintiff,  :
                                 :     17 Cr. 362 (LGS)
           -against-             :
                                 :     MEMORANDUM
FREDDIE JAIMAN,                   :     OPINION AND ORDER
                       Defendant.  :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Defendant Freddie Jaiman filed a motion to suppress out-of-court and in-court identifications of himself, and physical evidence recovered from a search of his residence. For the following reasons, the motion is denied.

**I.     BACKGROUND**

      Based on the parties' submissions and an evidentiary hearing, including an assessment of the credibility of witnesses, the Court makes the following findings of fact. The issues are whether the victim's identification of Defendant as the Impala driver and the warrantless search of Defendant's residence are lawful.

      **A.     The Underlying Event**

      On March 31, 2017, Rafael Contreras parked his car on Brook Avenue in the Bronx, New York. At approximately 6:50 a.m., while Contreras was seated in his car, a Chevrolet Impala struck his car. Both the driver of the Impala and Contreras exited their respective cars, and Contreras confronted the Impala driver about the collision. The Impala driver offered Contreras money, which Contreras refused. Contreras instead told the Impala driver that he would rather call the police about the accident. The Impala driver then returned to his car and drove away.

      When the Impala was stopped at a red light, on the corner of East 137th Street and Brook

Avenue, Contreras blocked the Impala with his own car. Both Contreras and the Impala driver again exited their respective cars and engaged in a verbal and physical fight for more than one minute. During this confrontation, the Impala driver pulled a firearm from his waistband and shot a single bullet in Contreras' direction, missing him. The Impala driver then fled in his car.

Immediately thereafter, Contreras called the New York City Police Department ("NYPD"). When the police officers arrived, Contreras described the Impala driver as a short, skinny Hispanic male with a beard. Contreras walked a police officer to the building he had seen the Impala driver leaving. The police then took Contreras to the Precinct for further investigation.

At the Precinct, Detective Paulo Ruiz interviewed Contreras. Contreras testified that he was nervous when he first arrived at the Precinct. Contreras "didn't want anyone innocent to be blamed for [the accident]." Contreras described the Impala driver to Detective Ruiz as a light-skinned Hispanic male, who exited from a building across the street from the accident. Contreras identified the building on Google Maps. Detective Ruiz asked his coworkers about the address of that building, and his coworkers gave him two addresses: 530 East 137th Street and 180 Brook Avenue.

### B. The Photograph Array Identification Procedure

After he interviewed Contreras, Detective Ruiz showed him a series of photographs using Photo Manager, a program that generates sequential photographs of individuals based on specific input criteria, and records the order and duration that each image is displayed. Photo Manager pulls photographs from a database with headshots of everyone arrested within a given Precinct. The NYPD uses Photo Manager to display photographs to an eyewitness for purposes of identifying a suspect. Detective Ruiz used three different criteria, based on Contreras'

2

description of the Impala driver and the neighboring building, to generate three separate photo arrays for Contreras to review. For each photo array, Detective Ruiz told Contreras that, if he saw the individual who shot at him, he should stop flipping to the next photograph. Contreras controlled how long each photograph in the array was displayed, and Detective Ruiz sat next to Contreras without looking at the photo array, in accordance with standard practice.

First, at 9:07 a.m., Detective Ruiz input as search criteria that the perpetrator was a white Hispanic male between eighteen and thirty years old, and that the arrest took place at the 040 Precinct. This search resulted in 310 photographs ("PM1"), but did not include Defendant's. Contreras viewed the array but did not make an identification.

Second, at 9:17 a.m., the Detective input as the sole criterion that the perpetrator's address was 180 Brook Avenue. This search generated forty-one photographs ("PM2"), including Defendant's. Contreras reviewed each photograph but did not make an identification. However, Contreras spent the longest time -- fourteen seconds -- viewing Defendant's photograph. After reviewing PM2, Contreras left the Precinct.

Third, at 11:31 a.m., Detective Ruiz input the single criterion that the perpetrator lived at 530 East 137th Street, and this criterion generated thirty-four photographs ("PM3"). Detective Ruiz reviewed PM3 and found that no photograph matched Contreras' description of the Impala driver. Detective Ruiz did not call Contreras back to the Precinct because he determined that Contreras did not need to review PM3.

On the same day, NYPD Police Service Area 7 officers brought a man suspected to be the Impala driver to the Precinct. He was six-feet tall, black and heavyset, and said he was at work at the time of the incident. Detective Ruiz determined that the man was not the assailant because he did not match Contreras' description and the man's work place corroborated his alibi.

3

Detective Ruiz did not show the man to Contreras for identification.

Later that day, Detective Ruiz received a phone call from a field intelligence officer ("FIO") who reported the license plate number of the Impala involved in the car accident, as reported by a confidential informant. Detective Ruiz searched the license plate number to generate a photograph of the car's owner. Detective Ruiz created a "six-pack" photo array, which included the image of the car's owner and five other individuals. Defendant's photo was not included in this array. Detective Ruiz called Contreras back to the Precinct at around 3:00 p.m. and showed him the six-pack photo array. Contreras did not make an identification.

At approximately 5:00 p.m., Detective Ruiz used Photo Manager to create a photo array based on the criterion that the perpetrator's address was 180 Brook Avenue ("PM2*"). At the time, Detective Ruiz had forgotten that he had already used this criterion to generate a photo array. This generated the same set of photographs as PM2. Contreras viewed four photographs in total, one photograph at a time. The images were displayed respectively for fourteen seconds, five seconds, two seconds and forty-one seconds, the last of which was Defendant's photograph. When he saw the last image, Contreras stated, "That's him. That's him," and identified Defendant in that photograph as the Impala driver. The next day, Contreras identified Defendant at an in-person line up. Detective Ruiz testified that he did not know the suspect's identity until Contreras' identification.

### C. The Arrest and the Subsequent Search

Defendant was arrested the same day as the in-person identification. Shortly after Defendant's arrest, Detective Ruiz spoke to the Government. Initially, Detective Ruiz reported only the last photo array, PM2*, because he had forgotten about the earlier arrays -- PM1, PM2, PM3 and the six-pack photo array. When the Government instructed Detective Ruiz to check his

4

notes to ensure that the Government had everything, Detective Ruiz discovered that he had conducted PM1, PM2 and PM3 and shown Contreras the six-pack photo array. Detective Ruiz informed the Government about the remaining photo arrays that had not resulted in an identification.

At the time of his arrest, Defendant was serving a sentence of three-years of supervised release. The conditions of his supervised release included:

- "The defendant shall notify the probation officer at least ten days prior to any change in residence or employment."
- "The defendant shall not commit another federal, state or local crime."
- "The defendant shall not unlawfully possess a controlled substance."
- "The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon."
- "[T]he defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer."
- "[T]he defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has *reasonable belief* that contraband or evidence of a violation of the conditions of the release may be found." (emphasis added).

Probation Officer Adam Pakula had been responsible for supervising Defendant since May 2016. Defendant first lived at 180 Brook Avenue, apartment 10D, where Officer Pakula made three home visits. Around January 2017, Defendant moved to 700 East 156th Street, Apartment 10B, Bronx, New York, where Officer Pakula made one home visit. Defendant did

not report any other address as being his residence.

On April 3, 2017, the U.S. Probation Office received notice of Defendant's arrest. Officer Pakula obtained the Criminal Complaint, which describes the collision and interaction between Contreras and Defendant, and states that Defendant "pulled a firearm out of his waistband and shot a single bullet at the Victim, which did not strike the Victim."

On April 6, 2017, Officer Pakula, with his team, which included Officer Washington Herrera, searched Defendant's residence at 700 East 156th Street. When they arrived, Defendant was not present, and Defendant's girlfriend answered the door. Officer Pakula announced himself and stated that he and his team would search the residence. Defendant's girlfriend permitted the probation officers to enter the residence.

Once inside the apartment, the officers split up to conduct the search. Officer Herrera searched the kitchen and found a box of cartridges and ammunition on top of a kitchen cabinet. He also found, on top of the refrigerator, a red Solo cup containing what appeared to be narcotics in baggies, with rice covering the baggies. As a result of this search, the officers recovered nineteen rounds of Hornady .380 caliber ammunition and approximately eighty-five packages of heroin. The heroin packages were stamped "Sin City" and prepared in a manner consistent with distribution to others.

On June 8, 2017, a federal grand jury indicted Defendant on one count of possession of ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1), and one count of distribution and possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(C).

### D. Detective Ruiz

Before the events relevant to this case, Detective Ruiz had been disciplined. While

working on a grand larceny case, he forgot that the victim had said that someone had called her to request money. Detective Ruiz failed to investigate this phone call and bring a potentially greater charge against the defendants in that case. Detective Ruiz's performance report was downgraded, and he lost ten vacation days as a result. Detective Ruiz's mistake was labeled "misreporting of crime statistics."

### E. The Evidentiary Hearing

On February 27, 2018, an evidentiary hearing was held. The hearing lasted over three hours. The Government called four witnesses: Detective Ruiz, Contreras, Officer Pakula and Officer Herrera. At the hearing, Contreras made an in-court identification of Defendant as the Impala driver.

The Government introduced the following evidence as exhibits: a color photograph of the area where the car accident took place, a color copy of PM1, PM2, PM3, and the six-pack photo array, a photograph of the lineup viewing, the Google Maps printout of the buildings near the site of the accident, a video recording of the altercation between the Impala Driver and Contreras captured from a security camera in the vicinity and photographs of items seized during the search. Defendant cross-examined the Government witnesses but did not call any witness. Defendant introduced one exhibit, the post-conviction chronological report.

## II. Photograph Identification Procedure

### A. Legal Standard

Identification of a Defendant by photograph is generally lawful. *Simmons v. United States*, 390 U.S. 377, 384 (1968). However, an unreliable eyewitness identification cannot be admitted against a defendant as its admission violates the Due Process Clause of the 14th Amendment. *See Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196,

202 (2d Cir. 2010) (quoting *Foster v. California*, 394 U.S. 440, 442 (1962)); *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). This principle applies to photographic identification. *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992); *accord United States v. Lee*, 660 F. App'x 8, 12 (2d Cir. 2016) (summary order).

When a defendant challenges the admissibility of an eyewitness identification as unreliable, the district court must engage in a two-step inquiry. *Perry v. New Hampshire*, 565 U.S. 228, 235 (2012). First, the court must determine whether the out-of-court identification procedure was "unduly and unnecessarily suggest[ive] that the defendant was the perpetrator." *Brisco*, 565 F.3d at 88 (quoting *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001)); *accord Perry*, 565 U.S. at 235. In so doing, the court must consider "the totality of the circumstances," including "the circumstances giving rise to the procedure, . . . the exigencies that the circumstances entailed, . . . [and] whether the identification procedure was warranted under the circumstances." *Brisco*, 565 F.3d at 90.

In contrast to showing a witness a single photograph, "[t]here is nothing inherently suggestive about a sequential display of a group of photographs." *United States v. Hall*, No. 14 Cr. 105, 2014 WL 2464943, at *2 (S.D.N.Y. May 13, 2014). "[T]he principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that that person was more likely to be the culprit." *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal quotation marks omitted) (citing *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984)); *accord United States v. Morgan*, 690 F. Supp. 2d 274, 283 (S.D.N.Y. 2010). If the procedures were not unduly suggestive, the identification is generally admissible because "any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its

8

admissibility." *Lee*, 660 F. App'x at 12 (quoting *United States v. Maldonado–Rivera*, 922 F.2d 934, 973 (2d Cir. 1990)).

      **B.**      **Discussion**

           **1.**      **General Procedure**

Defendant's identification was the result of a photo array generated by Photo Manager. Photo Manager selects photos based on objective input criteria, selects the order in which photos are displayed, and displays the photographs sequentially for a period of time determined by the witness. There is nothing "inherently suggestive" about this procedure, nor does Defendant point to any suggestive use of Photo Manager. *See, e.g.*, *Hall*, 2014 WL 2464943, at *2 ("There is nothing inherently suggestive about a sequential display of a group of photographs."); *United States v. Levy*, No. 04 Cr. 559, 2005 WL 2179650, at *2 (E.D.N.Y. Sept. 9, 2005) (finding that a photo array with photographs "depict[ing] African-American men of approximately the same age, roughly similar complexion . . . and roughly similar hairstyles . . . is not suggestive in its own right."). Moreover, Detective Ruiz did not look at the array while Contreras reviewed it, and in any event did not know or suspect that Defendant was the assailant.

In his supplemental letter, Defendant attempts to cast doubt on the photo identification procedure through minor inconsistencies in the witnesses' testimony. According to Defendant, Contreras testified that he had been shown "many" photographs while Detective Ruiz testified that Contreras had viewed only one six-pack photo array. Defendant mischaracterizes Contreras' testimony. The full transcript reveals that upon being asked whether he recognized the particular six-pack photo array as the one he saw at the Precinct, Contreras responded that he was shown "many" photographs, referring to the fact that he had seen both the six-pack array and the several PM's at the Precinct, and implying that Contreras could not recall whether the six-pack photo

9

array at issue is the one he saw at the Precinct. The testimony does not support Defendant's implication that Contreras reviewed more than one six-pack photo array at the Precinct.

### 2. Showing PM2 Twice

Defendant also argues that the photograph identification was unduly suggestive because PM2 was shown twice, first at 9:17 a.m., and later the same day at 5:00 p.m. This argument is rejected. Even though Contreras saw Defendant's photo twice in the process, Defendant's photo was not singled out. PM2 contained forty-one photographs, which all were available for viewing again in PM2*, and Contreras actually viewed four photographs twice at the point he identified Defendant. Moreover, at the time Conteras identified Defendant, he had viewed 361 photos. That he had seen Defendant's photo before among those 361 photographs, absent any other suggestive circumstances, does not taint the identification of Defendant. *See, e.g.*, *Concepcion*, 983 F.2d at 379 (finding that placing a suspect's picture in a second array after a witness has failed to select anyone from the first array does not automatically make the second array unduly suggestive); *Hill v. Colvin*, No. 16 Civ. 1301, 2018 WL 736013, at *9 (S.D.N.Y. Feb. 6, 2018) (finding that "having two identification procedures, in and of itself, was insufficient to render the procedures unduly suggestive. This is so even if the victim failed to identify anyone in the first array or [the defendant] is the only common denominator between the two identification proceedings."). In addition, Detective Ruiz credibly testified that he had forgotten he had shown Contreras PM2 earlier in the day.

That Contreras failed to identify Defendant the first time he viewed PM2 does not lead to an inference that his later identification was the product of a suggestive procedure. Contreras credibly testified that he was nervous during his first visit to the Precinct, and he was particularly cautious in identifying anyone because he did not want to implicate an innocent person. When

10

reviewing PM2, Contreras spent the longest time examining Defendant's photograph, even though this examination did not lead to identification. On his second visit to the Precinct, when he was less nervous, Contreras again viewed Defendant's photograph the longest in PM2*, and made a positive identification. Nothing about this sequence of events is farfetched or improper.

### 3. Detective Ruiz's History of Discipline

In the supplemental letter, Defendant seeks to undermine Detective Ruiz's credibility for having been disciplined for "misreporting . . . crime statistics." The label mischaracterizes Detective Ruiz's conduct. Detective Ruiz had been disciplined for failing to investigate fully and bring a potentially greater charge because he had forgotten that the victim had told him about an extortionate phone call. This failure was later labeled "misreporting of crime statistics." This incident, which involved Detective Ruiz's bringing a lesser than warranted charge, does not suggest that he might bring a greater than warranted charge or implicate an innocent person. This single, unrelated prior disciplinary action did not undermine Detective Ruiz's credibility in light of all the evidence, including his demeanor at the hearing. *Accord, e.g., United States v. Adams*, 316 F. App'x 60, 65 (2d Cir. 2009) (summary order) (upholding the district court's determination based on the totality of circumstances after an evidentiary hearing).

### 4. In-Court Identification

Because the identification procedure was not unduly suggestive, the motion to suppress Contreras' in-court identification of Defendant is denied. *See Concepcion*, 983 F.2d at 379 ("Normally if the pretrial procedures were not unduly suggestive any question as to the reliability of the proposed in-court identification will affect only the identification's weight rather than its admissibility."); *accord Lee*, 660 F. App'x at 12.

**III. Warrantless Search**

    **A.    Legal Standard**

The Fourth Amendment protects the rights of private citizens to be free from unreasonable government intrusion into areas where they have a legitimate expectation of privacy. *See* U.S. Const. amend. IV; *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017). "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (internal quotation marks omitted); *accord United States v. Barner*, 666 F.3d 79, 83 (2d Cir. 2012).

Warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One of the exceptions to the warrant requirement involves searches involving those on supervised release. "Supervision . . . is a special need of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002) (internal quotation marks omitted) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). "[B]ecause of the strong government interest in ensuring that a releasee complies with the terms of his supervised release, 'the probable cause requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release.'" *United States v. Townsend*, 371 Fed. App'x 122, 124 (2d Cir. 2010) (summary order) (quoting *Reyes*, 283 F.3d at 462).

"[T]he warrantless search of [a person on probation], supported by reasonable suspicion and authorized by a condition of probation, [is] reasonable within the meaning of the Fourth Amendment." *Knights*, 534 U.S. at 122; *see also Barner*, 666 F.3d at 84 n.2 (suggesting that the law as to a warrantless search may be the same for a person on probation, parole or supervised release). Under the special needs exception to the Fourth Amendment, it is "reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a . . . [warrantless] search" of individuals on supervised release or probation. *Griffin*, 483 U.S. at 869; *accord Townsend*, 371 F. App'x at 124.

On a motion to suppress physical evidence, the burden of proof is on the defendant who seeks the suppression. *United States v. Feldman,* 606 F.2d 673 (6th Cir.1979), *cert. denied,* 445 U.S. 961 (1980). However, once the defendant has established some basis for the motion, for example, by a preliminary showing of a warrantless search, then the burden shifts to the government to show, by a preponderance of the evidence, that the warrantless search was reasonable. *United States v. Sacco,* 563 F.2d 552, 558 (2d Cir. 1977), *cert. denied,* 434 U.S. 1039 (1977); *see also United States v. Matlock,* 415 U.S. 164, 177 (1974); *accord United States v. Levy*, 217 F. Supp. 3d 643, 660 (E.D.N.Y. 2016).

**B.    Discussion**

Defendant's motion to suppress the physical evidence recovered from the warrantless search of his residence is denied. The probation officers' search of Defendant's residence was expressly permitted by the terms of Defendant's supervised release -- "[T]he defendant shall submit his . . . residence . . . to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found." Defendant's conditions of release included that he "not possess a firearm [or] ammunition."

Defendant was arrested for shooting at Contreras, implying that he possessed a firearm and ammunition. Officer Pakula, who had reviewed Defendant's criminal complaint from the arrest, had a reasonable belief that a firearm or ammunition might be found at Defendant's residence, in violation of his conditions of release. Consequently, the warrantless search of Defendant's residence was consistent with the search condition of his supervised release and reasonable under the Fourth Amendment. *Accord, e.g., Barner*, 666 F.3d at 85 (holding parole officer's search of defendant's residence to be reasonable under the Fourth Amendment when parole officer had received a tip that defendant possessed a gun and had fired at the complainants in violation of defendant's parole condition); *United States v. Mazzara*, No. 16 Cr. 576, 2017 WL 4862793, at *14 (S.D.N.Y. Oct. 27, 2017) (finding that "[b]ecause [the defendant] was subject to a condition of release allowing for warrantless searches, and because the officers had reasonable suspicion that their search would reveal evidence of a crime, the search was reasonable under the Fourth Amendment."); *United States v. Harrison*, No. 15 Cr. 389, 2016 WL 1070816, at *3 (E.D.N.Y. Mar. 14, 2016) ("Because of Defendant's status as a supervisee, and the specific language of the search condition, there is no question that Probation Officers were, at most, required to have reasonable suspicion to search Defendant's premises.").

In the supplemental letter, Defendant in effect argues that the condition of supervised release requiring him to submit to a search based on the probation officer's reasonable belief is unconstitutional because the Fourth Amendment requires warrant and probable cause for the search of a person's residence. Defendant misunderstands the law. As discussed above, the federal system of supervised release "presents 'special needs' beyond normal law enforcement that may justify departure from the usual warrant and probable-cause requirements." *Reyes*, 283 F.3d at 461 (quoting *Griffin*, 483 U.S. at 873–74); *accord Townsend*, 371 F. App'x at 124

(finding the warrantless search of defendant's residence constitutional where his probation officer received specific information from law enforcement officials working on an investigation that suggested contraband might be found in his home, and a condition of his release was that he submit his residence to a search based on the reasonable belief that contraband may be found).

Defendant also argues that even if the search condition of supervised release was constitutional, the requirements of the condition were not met, because the residence was not under "his control" as he was detained at Riker's Island at that time. This argument is incorrect. The condition provides for the search of Defendants "residence, place of business, vehicle, *or any other premises under his control*." (Emphasis added). The search was conducted at Defendant's residence and not at "other premises under his control." The location of the search -- 700 East 156th Street, Apartment 10B -- was listed in the Probation Department's records as Defendant's principal residence, and the probation officer previously had conducted a home visit there. Defendant did not present any evidence that he resided elsewhere.

Defendant also argues that because the probation officer did not inform Defendant's girlfriend that she had the "right to refuse" the search, the warrantless search was unconstitutional and that the requirements of the search condition were not met. Defendant cites no law to support this argument and it is incorrect. First, it was Defendant's responsibility -- not the probation officer's -- to notify the girlfriend about the possibility of a search. The last sentence of the search condition states, "The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition." Second, she did not have the "right to refuse" the search in the sense that the condition also states that "[f]ailure to submit to a search may be grounds for revocation [of supervised release]." Third, because Defendant's search was conducted according to the conditions of his supervised release, Defendant's

15

expectation of privacy under the Fourth Amendment was substantially diminished. *United States v. Edelman*, 726 F.3d 305, 310 (2d Cir. 2013). Accordingly, neither Defendant nor his girlfriend had the right to refuse the warrantless search without the consequence of revocation.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is DENIED.

SO ORDERED.

Dated: April 17, 2018
      New York, New York

                                      **LORNA G. SCHOFIELD**
                                 **UNITED STATES DISTRICT JUDGE**